## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| **JURIJUS  KADAMOVAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 2:11-cv-15-WTL-DKL** |
| | ) | |
| **JO CHARLES LOCKETT, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### ENTRY ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Jurijus Kadamovas is an inmate currently incarcerated at the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute"). On January 18, 2011, Kadamovas filed a civil rights complaint, pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), alleging that Defendants J. Charles Lockett, T. K. Cozza-Rhodes, Craig Coil, Michael Stephens, Anthony Serrato,[1] and Tracy Heiser (collectively "the Defendants")[2] violated his First and Eighth Amendment rights and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(a) ("RFRA"). Kadamovas asserts three claims. In Count One, he alleges his free exercise rights under the First Amendment and RFRA were violated because the food served to him while on the prison's religious diet ("Common Fare diet") was inadequately cooked or prepared or spoiled or nutritionally inadequate. Dkt. No. 1, pp. 7-17. In

---

[1]Kadamovas misspelled the names of Defendants Serrato and Stephens in his Complaint. **The Clerk is directed to correct the spelling on the docket.  The Clerk is further directed to add the first names of Defendants Serrato and Heiser to the docket and to correct the last name of Defendant Cozza-Rhodes.**

[2]Kadamovas also asserts claims against Richard Myers.  Myers has not been served with the summons and Complaint in this case and has not appeared.  Accordingly, Kadamovas' claims against Myers are not addressed in this Entry, and the term "Defendants" as used in this Entry does not include Myers.

Count Two, Kadamovas claims that his Eighth Amendment rights were violated by the Defendants because the inadequately cooked or prepared food caused him to become sick. Dkt. No. 1, pp. 18-20. Lastly, Count Three alleges that the Defendants denied Kadamovas medical treatment in violation of the Eighth Amendment. Dkt. No. 1, pp. 20-22. The Defendants now seek resolution of this action through summary judgment.

For the reasons explained below, the Defendants' motion for summary judgment (Dkt. No. 38) is **granted in part and denied in part.**

## I. <u>STANDARD</u>

A motion for summary judgment asks that the Court find that a trial is unnecessary because the uncontroverted admissible evidence of record dictates a verdict in the moving party's favor as a matter of law. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Pro. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. Pro. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion will result in the movant's fact being considered undisputed. Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson v. Cambridge Indus.,* 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id.* at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). When evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex,* 477 U.S. at 330. In addition, although as a *pro se* litigant Kadamovas' filings are to be liberally construed, his "pro se status doesn't alleviate his burden on summary judgment." *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011).

## II.  PRELIMINARY EVIDENTIARY MATTERS

The Defendants take issue with much of the factual allegations made by Kadamovas, arguing that Kadamovas' declarations, verified complaint, and exhibits contain arguments, conclusions, speculation, and inadmissible hearsay, none of which are admissible to refute a summary judgment motion.  *See* Fed. R. Evid. 801 and 802; *Stinnett v. Iron Works Gym/ Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002) (evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at

trial); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994) (non-moving party must demonstrate that there is admissible evidence that will support its position).

The Defendants are correct. Portions of Kadamovas' personal declaration (Dkt. No. 50-2, pp. 2-10) are not admissible because they contain inadmissible hearsay. The inadmissible hearsay is found at docket number 50-2, ¶¶ 5, 6, 7, 9, 10, 13-17. Additionally, paragraphs 12 and 17 of Kadamovas' declaration are inadmissible because those paragraphs contain legal assertions, arguments, conclusions, or conjecture not otherwise supported by admissible evidence. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990) (mere speculation or conjecture, even if presented in affidavit form, would not convert the statements into competent evidence); *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."). Kadamovas' verified Complaint[3] also is filled with legal conclusions, legal arguments, and alleged facts about which he could not have personal knowledge. None of this inadmissible evidence has been considered by the Court in making this ruling.

The Defendants also argue that the inclusion of documents and exhibits referencing inmate Wesley Purkey and any problems that Purkey may have experienced with his conditions of confinement are irrelevant to Kadamovas' claims. The Defendants are correct that Purkey's partial grievances do not address Kadamovas' claims, other than to mirror the same general allegations with facts that apply only to Purkey.  In addition, declarations authored by inmates Purkey, Caro, Sirristerra, and Barrett contain various out-of-court statements allegedly made by

---

[3]Because Kadamovas signed his Complaint under penalty of perjury, the Court may treat that pleading as an affidavit and consider it as evidence. "By declaring under penalty of perjury that the [Complaint] was true . . . he converted the [Complaint], or rather those factual assertions in the [Complaint] that complied with the requirements for affidavits specified in the rule . . . into an affidavit." *Dale v. Lappin,* 376 F.3d 652, 655 (7th Cir. 2004) (*quoting Ford*, 90 F.3d at 247).

third parties intended to prove the truth of the matter asserted.[4] As stated above, testimony based on inadmissible hearsay, speculation, and conjecture was not considered in ruling on this motion for summary judgment.

## III.  <u>BACKGROUND</u>

The properly supported facts of record, viewed in the light most favorable to Kadamovas, the non-moving party, are as follow.

### A.  The Bureau of Prison's Religious Diet Program

Pursuant to Program Statement P5360.09, Religious Beliefs and Practices, the Bureau of Prisons ("Bureau") provides inmates requesting a religious diet a reasonable opportunity to observe their religious dietary practice through a religious diet menu. The Bureau's religious diet program is identified as the "Common Fare Menu." Religious diet, Common Fare Menu and Certified Food Menu are all terms which are used interchangeably to identify the religious diet menu provided by the Bureau. If an inmate wishes to participate in the religious diet program, he must simply make that request to the Chaplain in writing.  The inmate is then required to complete a religious diet interview articulating his religious motivation for participation in the religious diet program.  At any given time there are between 100-200 inmates on the religious diet at FCC Terre Haute.  The food preparation for each of those inmates should be the same.

Participation in the religious diet program is voluntary on the part of the inmates, and Kadamovas has voluntarily entered and left the program several times during his incarceration. On March 10, 2008, Kadamovas requested to be placed on the Common Fare Menu. Since August 2009, Kadamovas' stated religious preference has been Orthodox Christian. The Common Fare Menu is approved to comport with the dietary requirements of the Orthodox

---

[4]These inmates' declarations are appropriate, however, to dispute any assertion that Kadamovas was the only inmate experiencing problems on the religious diet.

Christian Church. On October 13, 2011, Kadamovas requested that he be removed from the Common Fare Menu; he has not asked to be returned to the religious diet program since that date.

### B.  The Bureau's Common Fare Menu

The Common Fare Menu is a uniform menu followed on a nationwide basis within the Bureau and must be followed by each institution. In arriving at religious menus, the Bureau's Central Office Food Services and Religious Services staff work closely with outside religious entities to ensure the meals provided meet religious dietary standards and also provide sufficient nutrition for inmates. The Common Fare Menu diet also meets the U.S. Department of Agriculture's nutritional standards.

Substitutions of food items to properly complete the daily menu can be, and are, made by food service staff. There are a variety of reasons that Food Services might run short of a particular menu item and food substitutions may be required, including spoilage, inoperative equipment, too few of a particular food item delivered, natural disaster disrupting delivery, unexpected increase in cost, etc. When substitutions are required to be made, managers are made aware that an unplanned change is required to feed the inmate population. Policy allows these decisions to be made at the time that food is being handled, inspected, prepared, and served.

### C.  Food Distribution at FCC Terre Haute

Kadamovas is housed in the Special Confinement Unit ("SCU") where meals are served in prepared trays. Trays are loaded with food items consistent with the suggested menu for Common Fare meals to be served to assigned inmates in locked units who are designated Common Fare status. These trays are processed in Food Services and brought to the SCU housing unit in carts. The trays are removed by custodial staff in the housing unit and should be

6

delivered randomly to the inmates designated on the Common Fare program. However, on occasion, and specifically on September 23, 2011, Kadamovas received a tray with his name written on it.

If the Common Fare meal trays were to arrive from Food Service to the housing unit and a food item was missed or delivered in error, unit officers have the ability to contact Food Service staff on the radio and remedy the problem.

### D.  The Role of the Defendants at FCC Terre Haute

#### 1.  Defendant Lockett

Charles Lockett was the Complex Warden at the FCC Terre Haute from February 2011 until August 2012. As Warden at FCC Terre Haute, Lockett was responsible for administrative oversight over the everyday operation of the prison. He exercised administrative oversight and supervision of the staff and programs and was advised of security, administrative, budgetary, or personnel related issues at the prison.[5]

Lockett did not personally participate in or oversee the ordering or receipt of daily food supplies, preparation of menu items, or food preparation in the Food Services Department. He was not personally involved in the daily inspection of food items or the preparation of any food for inmate consumption. Lockett was not personally involved in the preparation of any inmate meal trays. The only knowledge Lockett had about what food was on the Common Fare Menu, or how it was to be prepared, was obtained because of his general supervisory role and because

---

[5]The parties dispute whether Lockett ever screamed at the SCU inmates, or threatened Kadamovas or other inmates with a loss of additional rights or privileges because of their making complaints about prison conditions. Specifically, Kadamovas claims that Lockett threatened him and other inmates with disciplinary action in retaliation for presenting complaints to him and for engaging in a hunger strike. This dispute is not material to the claims in this action, but rather is the subject of another case. *See Kadamovas v. Lockett, et al.,* 2:11-cv-258-WTL-WGH (complaint alleging constitutional violations based on hunger strikes).

he had to respond to Kadamovas' administrative remedies or complaints. Lockett had

Kadamovas' complaints investigated (by others) and provided the required response. Lockett, as

a result of Kadamovas' complaints, had regular checks put into place to ensure quality by food

service staff, and had the Unit Manager for the SCU conduct numerous random spot checks of

the food served in the SCU over a period of several weeks. Lockett had no personal knowledge

of any spoiled or outdated food items being served to the SCU inmates.

### 2. *Defendant Cozza-Rhodes*

Assistant Warden Cozza-Rhodes was responsible for administrative oversight over the

everyday operation of the Food Services and Religious Services at FCC Terre Haute. Cozza-

Rhodes did not personally oversee the ordering or receipt of daily food supplies, menu selection,

or food preparation. Cozza-Rhodes did not have any role in the determination of which specific

food items were placed upon the National Common Fare Menu, and she did not inspect any daily

food items or prepare any food for inmate consumption.

Cozza-Rhodes testified that, consistent with Bureau Policy and as part of her general

supervisory duties in Food Service, she was advised whenever there was a food substitution for

the religious diet menu. Prior to September 13, 2011 (when Policy Statement 4700.06 became

effective), BOP Policy Statement 4700.05 provided:

> Changes to the nationally approved certified foods menus may not be made at the
> institutional level, except when seasonal unavailability of specific fresh produce
> items dictates that temporary substitutions be made. All substitutions will be
> approved by the appropriate Associate Warden. Cook Supervisors will notify
> supervisory staff when unscheduled changes to the menu are necessary.

Cozza-Rhodes told Kadamovas that she never approved any substitutions.

The parties dispute whether Cozza-Rhodes told Kadamovas, or any other inmate, that there were food shortages at FCC Terre Haute due to budget constraints. There were no food shortages at FCC Terre Haute because of budget constraints during the relevant time period.

### 3. Defendant Serrato

Anthony Serrato has been the Food Service Administrator at FCC Terre Haute since November 2011. Serrato, as Food Service Administrator, generally oversees the everyday operation of the Food Service department and the staff. Serrato does not personally prepare the food for inmates, or supervise that preparation, which is managed by a cook supervisor whom he generally supervises. Serrato does not determine which specific food items are placed on the National Common Fare Menu, as it is maintained at the national level and is analyzed by a registered dietitian annually. "Planned" changes to the National Common Fare Menu can only be made at the Central Office level.

The pre-packaged certified processed foods served to inmates are not prepared by Serrato, but are prepared by staff under the supervision of a Staff Foreman according to the specific preparation instructions provided by the manufacturer.

Serrato is not personally involved in the final distribution of food trays to inmates. Food trays are prepared by cooks supervised by a Food Service Foreman, and the trays are placed on food carts for delivery to housing units. Serrato had no personal knowledge of any food shortage or failure to deliver a particular food item to Kadamovas on any given date. Serrato was not personally or directly involved in the delivery or failure to deliver any particular food item to Kadamovas. The loading of a particular food tray and the delivery of a food tray to an inmate are not functions that Serrato performs.

### 4. *Defendant Coil*

Craig Coil was the Food Services Administrator at FCC Terre Haute from 2007 to 2011. As Food Services Administrator, Coil's responsibilities were to oversee operations of the Food Service departments throughout FCC Terre Haute. Day-to-day supervision of food preparation was accomplished under Coil's general supervision by foremen supervising food preparers and cooks. Coil was not personally involved in the preparation of the inmates' food or the placement of food items on a particular inmate's tray.

The decisions Coil was required to make as Food Services Administrator at FCC Terre Haute involved the necessity to substitute food items in the daily menu on numerous occasions, and when he was required to make those decisions, he made them according to Bureau policy.

### 5. *Defendant Stephens*

Michael Stephens was the Unit Manager in the SCU at FCC Terre Haute from August 2010 to 2012. As the Unit Manager for the SCU, Stephens was responsible for the management of the unit team and the overall running of the SCU unit. Stephens did not have any direct or personal responsibility for the preparation of the food served to the inmates in the SCU. Stephens did not personally prepare, inspect, cook, handle, or deliver the daily meals to inmates in the SCU. As the Unit Manager, Stephens would make daily rounds when in the unit as well as participate in weekly executive staff rounds.

Kadamovas complained to Stephens on a few occasions in 2011 about his religious diet. Based on his complaints, and in an effort to resolve his complaints, Stephens conducted random spot checks of the food served in the SCU over a period of several weeks. The spot checks that Stephens conducted involved him randomly pulling trays from the food cart and examining the

food.[6] During these inspections and random spot checks, Stephens never observed any spoiled or outdated food items being served to the inmates in the SCU.

### 6.  Defendant Heiser

Tracy Heiser is a Registered Nurse who has been employed at FCC Terre Haute since 2006.  Medical personnel are in the SCU multiple times daily for a variety of reasons. Inmates should be allowed to see a doctor when needed, and medicines are distributed at least three times a day. All medical staff, not just nurses, are required to respond to sick call requests.

Heiser was on maternity leave from July 2010 to September 2010, and therefore was not on duty at FCC Terre Haute during August 2010. Heiser refused to assist Kadamovas with a sick call request to allow him treatment for food poisoning in November of 2010.

## IV.  DISCUSSION

### A.  Right to Free Exercise of Religion

In Count One of his Complaint, Kadamovas claims that Defendants Lockett, Cozza-Rhodes, Stephens, Coil, and Serrato violated his constitutional right to the free exercise of his religion under the First Amendment and as set forth in RFRA.

The Free Exercise Clause of the First Amendment prohibits the government from imposing a "substantial burden" on a "central religious belief or practice." *Kaufman v. Pugh*, ___ F.3d ___, 2013 WL 4256968, *2 (7th Cir., Aug. 16, 2013). But the Free Exercise Clause "does not prohibit governments from burdening religious practices through generally applicable laws." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (*citing*

---

[6]Kadamovas asserts without citation to admissible evidence that Common Fare Meals are not served in trays as regular meals are. Instead, he alleges that they are served in pre-sealed containers called "entrees." PS 4700.05, Chapter 4 states that, ordinarily, certified food component meals will be served with disposable trays. In addition, Kadamovas states in his declaration (see ¶ 17) that his food was served on a Styrofoam tray.

11

*Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990)). Under the

Free Exercise Clause, a regulation that impinges on an inmate's constitutional rights, such as one

imposing a "substantial burden" on free exercise, may be justified if it is "reasonably related to

legitimate penological interests." *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987) (*quoting Turner*

*v. Safley*, 482 U.S. 78, 89 (1987)). Given the limitations of the First Amendment as set forth by

the Supreme Court in *Smith*, Congress enacted RFRA. Under RFRA,[7] the federal government

may not, as a statutory matter, substantially burden a person's exercise of religion "even if the

burden results from a rule of general applicability" unless the government demonstrates that the

burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive

means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(a)–(b); *see*

*Grote v. Sebelius*, 708 F.3d 850, 853 (7th Cir. 2013).

Claims under both the First Amendment and RFRA are evaluated under the substantial

burden test, which requires the plaintiff to show that the defendants substantially burdened his

free exercise rights. *See Patel v. Bureau of Prisons*, 515 F. 3d 807, 814 (8th Cir. 2008) ("[T]he

same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA, and

RLUIPA."). "[A] substantial burden on the free exercise of religion . . .  is one that forces

adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains

conduct or expression that manifests a central tenet of a person's religious beliefs, or compels

conduct or expression that is contrary to those beliefs." *Koger v. Bryan,* 523 F.3d 789, 798 (7th

Cir. 2008) (internal quotation and citation omitted); *see also Thomas v. Review Bd. of Ind.*

*Employment Sec. Div.*, 450 U.S. 707, 718 (1981). As explained above, once it is determined that

---

[7]The Seventh Circuit has held that RFRA entitles a prisoner to sue prison officials in their
individual capacities. *See Nelson v. Miller*, 570 F.3d 868, 886 (7th Cir. 2009).

government action imposes a substantial burden on a prisoner, the review of that burden under the Free Exercise Clause differs from RFRA. *See Patel*, 515 F.3d at 813.

If Kadamovas is to survive summary judgment on his claims under either the Free Exercise Clause or RFRA, he must have evidence that his sincerely held religious beliefs were burdened by the Defendants' conduct. *See Vinning-El v. Evans*, 657 F.3d 591, 593-4 (7th Cir. 2011) (sincere personal religious faith entitled to protection); *Patel*, 515 F.3d at 813. For purposes of this ruling, the Court assumes that Kadamovas' sincerely held religious belief led him to maintain a religious diet during the relevant time period.

There is no dispute that at all times relevant to this action there was a religious diet program (*i.e.*, Common Fare Menu or Kosher Religious Diet as designated under BOP Policy, PS # 4700.05) available to Kadamovas that on paper comported with his professed Orthodox Christian faith. Dkt. Nos. 38-15, ¶ 5 and 50, p. 28-29.  Kadamovas claims, however, that in practice the religious diet program was and is unavailable to him because he was forced to decline that diet program due to its nutritional inadequacy. *See Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (recognizing that a prisoner can bring a free exercise claim where he is "put to an improper choice between adequate nutrition and observance of the tenets of his faith"). Kadamovas asserts that the food he received while on the Common Fare Menu was nutritionally inadequate, spoiled, or insufficient in variety or quantities, and that he suffered injury from food-borne spoliation or contamination. Kadamovas argues that he was thus forced to choose between inadequate nutrition and food-borne poisoning or adhering to the tenets of his belief. He blames budget reductions for the protracted shortages and serving of unauthorized food items. Dkt. No. 50, p. 28.

In response, the Defendants argue that Kadamovas has failed to present evidence to support his claims and thus he has failed to meet his burden of proof.[8] Kadamovas is competent to testify as to the food that he was provided while on the religious diet, but the testimony he references, *see* Dkt. No. 50, pp. 30-32, lacks the specificity to raise a material fact regarding whether the food provided on the religious diet during the relevant time period imposed a "substantial burden" on the free exercise of his religion.

Even assuming there is sufficient evidence to support Kadamovas' claims that his sincerely held religious beliefs have been burdened by the execution of the Religious Diet Program at FCC Terre Haute, however, Kadamovas' claim still fails. Both the Free Exercise and RFRA claims are brought against individual Defendants. In order to survive summary judgment on his Free Exercise or RFRA claim under *Bivens*, Kadamovas must demonstrate that each Defendant was personally involved in the deprivation of his rights. *See Gossmeyer v. McDonald*, 128 F. 3d 481, 494 (7th Cir. 1997). As the Seventh Circuit explained in *Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012) (*rehearing en banc*):

> *Iqbal* held that knowledge of subordinates' misconduct is not enough for liability. The supervisor must want the forbidden outcome to occur. Deliberate indifference to a known risk is a form of intent. *But Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), holds that, to show scienter by the deliberate-indifference route, a plaintiff must demonstrate that the public official knew of risks with sufficient specificity to allow an inference that inaction is designed to produce or allow harm. A warden's knowledge that violence occurs frequently in prison does not make the warden personally liable for all injuries. *See McGill v. Duckworth*, 944 F.2d 344 (7th Cir.1991). Prisons are dangerous places, and misconduct by both prisoners and guards is common. Liability for wardens would be purely vicarious. *Farmer* rejected a contention that wardens (or guards) can be liable just because they know that violence occurs in prisons and don't do more to prevent it on an institution-wide basis.

---

[8]The Defendants do not suggest for purposes of this motion that the conduct alleged by Kadamovas was either justified as "reasonably related to legitimate penological interests" as required by the First Amendment, *O'Lone*, 482 U.S. at 349, or "in furtherance of a compelling governmental interest" as required under RFRA. *See Grote,* 708 F.3d at 853.

*Id.* at 204-05. In other words, to survive summary judgment Kadamovas needs to point to evidence from which a reasonable trier of fact could conclude that a specific defendant knew of a substantial risk to Kadamovas' ability to freely exercise his religious belief and ignored that risk because he wanted Kadamovas (or similarly-situated persons) to be harmed. The Defendants cannot be held liable on the theory that they did not do enough to combat their subordinates' misconduct. *Id.*

The Defendants argue that Kadamovas has failed to demonstrate the direct personal involvement required to impose liability on them for violation of his Free Exercise or RFRA rights. In response, Kadamovas argues that Defendants Lockett, Cozza-Rhodes, Coil, Serrato, and Stephens were advised many times through the administrative grievance process and written communications of the ongoing problems with the Religious Diet Program and refused to take any remedial actions.

It is undisputed that Defendants Lockett, Cozza-Rhodes, Serrato, Coil, and Stephens were not personally or directly involved in the selection of food or the preparation and delivery of daily meals to inmates, including Kadamovas.[9] The Complaint points the finger of blame for the uncooked or spoiled food entrees at Correctional Officer Myers, as well as other individuals who are not named as defendants (i.e., a Lt. Cox), who he alleges served the improper food and refused to correct or properly re-heat it. The Complaint also alleges that Myers refused to call Food Services to resolve the alleged food shortage on Kadamovas' tray. Dkt. No. 1, ¶ 39.

---

[9]Kadamovas suggests in his Statement of Material Facts in Dispute that Cozza-Rhodes was required to approve substitutions pursuant to policy. See PS 4700.05. There is no dispute, however, that she did not in fact approve substitutions. Whether this violated policy depends on the interpretation of the word "substitutions" and "unscheduled changes." It is well established, however, that violations of regulations or policies or procedures do not rise to the level of a *Bivens* violation. *See, e.g., Davis v. Scherer*, 468 U.S. 183, 194 (1984); *Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986). Similarly, the dispute regarding whether Kadamovas received a menu as directed by policy is not material.

Kadamovas has failed to establish that defendants Lockett, Cozza-Rhodes, Serrato, Coil, and Stephens were personally and directly involved in violations of his religious exercise as protected by the Free Exercise clause and RFRA. *Cf. Johnson v. Snyder*, 444 F.3d 579, 583-84 (7th Cir. 2006) (letters to Director insufficient to create a genuine issue of material fact regarding personal responsibility of Director, where Director had delegated responsibility for reviewing grievances, and there was no evidence that Director had read letters). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997). Accordingly, Defendants Lockett, Cozza-Rhodes, Serrato, Coil, and Stephens are entitled to judgment as a matter of law on Count One of the Complaint.

## B.  Conditions of Confinement.

In Count Two, Kadamovas alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Defendants Lockett, Cozza-Rhodes, Serrato, Coil, and Stephens allegedly served him uncooked or spoiled food entrees. (*See* Dkt. No. 1, Count Two, pp. 18-20). Defendant Nurse Heiser allegedly denied him medical services. (*See* Dkt. No. 1, Count Three, pp. 20-22).

To state an Eighth Amendment claim, a plaintiff must allege facts showing that: (1) he suffered substantial harm from the deprivation of humane conditions of confinement, and (2) the defendant acted with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). With respect to the subjective component of this two-part test, "a plaintiff must establish that defendant(s) knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Id.* at 847. "[A] prison official cannot be found

16

liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

### 1. Count Two: Food Service Complaints

The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement, including ensuring that inmates receive adequate food. *Farmer*, 511 U.S. at 832; *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). Withholding food from prisoners is a deprivation of a basic need that in some circumstances will satisfy the objective aspect of the *Farmer* test. *See Atkins v. City of Chicago*, 631 F.3d 823, 830 (7th Cir. 2011) ("Depriving a person of food for four days would impose a constitutionally significant hardship."); *Foster v. Runnels*, 554 F.3d 807, 812–13 (9th Cir. 2009) (concluding that denial of 16 meals in 23 days was sufficient to support claim of deliberate indifference); *Reed v. McBride*, 178 F.3d 849, 853–54 (7th Cir. 1999) (concluding that first *Farmer* element was satisfied by allegation that infirm inmate was denied food for three to five days); *Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir. 1998) (concluding that denial of four consecutive meals was a sufficiently serious deprivation).

The Defendants argue that Kadamovas has failed to produce any admissible evidence to state an Eighth Amendment claim against them.[10] Kadamovas makes the conclusory allegation that ". . . the defendants ossify obstinacy to properly cook and serve the religious entrees. . . ." Dkt. No. 1, ¶ 37. These conclusory allegations are contrary to the admissible evidence before the

---

[10]Defendant Nurse Heiser's duties involve the medical field and provision of medical support and services—not food service duties—and these claims could not involve her. Not only does Kadamovas not assert his claim in Count Two against Nurse Heiser, but the undisputed division of labor recognized within the Bureau would not have the nursing staff involved in food service issues.

Court. The duties and responsibilities of Defendants Lockett, Cozza-Rhodes, Serrato, Coil, Stephens, and Heiser did not involve cooking and serving daily meals to inmates, and in fact these Defendants were not directly and personally involved in the preparation and delivery of food entrees to Kadamovas.

The parties dispute whether all pre-packaged food entrees were prepared and cooked according to the manufacturer's specifications as contained on their labels. If the food was not properly prepared and cooked, however, that failure was due to an individual's actions in violation of the FCC-Terre Haute and Bureau's Food Services policy, which provides a detailed process promoting the safe receipt, processing, handling, and distribution of foods to the inmates. There is no evidence that any of the Defendants who have moved for summary judgment were responsible for the improper cooking or preparation of food.

In addition, the Defendant administrators have provided contingencies to accommodate problems in the food delivery process. The record establishes that the policies enforced at FCC Terre Haute were intended to accomplish the proper food preparation for inmates, or to allow an immediate remedy if there was a problem with the temperature of the food item or the quantity of the food tray. For example, the Food Services Department purchased microwaves for each housing unit so that those persons delivering the meals could re-heat entrees if requested to do so by the inmates. Moreover, if some food items are inadvertently omitted from a food tray, the procedures provide that the person serving the meal can radio Food Service to remedy the problem.

Kadamovas asserts that the Defendants are liable for Eighth Amendment violations related to the food preparation and service based upon their general supervisory responsibilities, not their direct or personal responsibility. As explained above, Kadamovas' allegations of

general knowledge and supervision are not adequate to meet his burden to establish a viable Eighth Amendment claim against these named defendants. The undisputed evidence of record before this Court establishes that the Defendants either did not know about Kadamovas' food complaints or, when they were advised about the complaints, they took action, investigated the complaints, found them to be without merit, and reported those findings to Kadamovas. As to the subjective component of the *Farmer* test, the admissible evidence establishes that when the Defendants knew of Kadamovas' complaint about food selection, preparation, or delivery, the Defendants did not ignore those complaints, but acted upon them to investigate the allegations and determined that there were no problems that required action. Kadamovas' disagreement with the investigation's conclusion does not make the administrators indifferent to his complaints.

The admissible evidence of record establishes that Kadamovas has failed to establish both the objective and the subjective component required to state a proper Eighth Amendment claim against Defendants Lockett, Cozza-Rhodes, Serrato, Coil, Stephens, and Heiser.  The Defendants therefore are entitled to judgment as a matter of law as to that claim.

### 2. Count Three – Medical Care Complaints

Count Three of the Complaint alleges that Nurse Heiser failed to provide medical care to Kadamovas. Dkt. No. 1, pp. 20-22. Count Three does not assert any claims against Defendants Lockett, Cozza-Rhodes, Serrato, Coil, or Stephens; however, in his response in opposition to summary judgment Kadamovas generally asserts his denial of medical care claim against Defendant Lockett, Nurse Heiser and Officer Myers. *See* Dkt. No. 50, p. 38. Kadamovas generally asserts that he was entitled to, but did not receive, medical treatment in August 2010 and November 2010. *See* Dkt. No. 50, pp. 38- 41.

The Eighth Amendment imposes a duty on the government "'to provide adequate medical care to incarcerated individuals.'" *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (*quoting Boyce v. Moore*, 314 F.3d 884, 888–89 (7th Cir. 2002)). As stated above, to survive summary judgment Kadamovas must satisfy two elements, one objective and one subjective. *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). To satisfy the objective element in the medical care context, Kadamovas must "present evidence supporting the conclusion that he had an objectively serious medical need." *Id.* (internal quotation omitted). "'A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir.2012) (*quoting Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). As for the subjective element, Kadamovas must show that the Defendants were aware of his serious medical need and were deliberately indifferent to it. *McGee*, 721 F.3d at 480.

The admissible evidence of record establishes that Defendant Lockett had no role in the delivery of daily medical care and services. Dkt. No. 38-2, ¶ 12. Kadamovas' claims for denial of medical care cannot be premised upon a general responsibility as a supervisor, but require a direct and personal role in the violation asserted, which is missing in this record as to Lockett. Therefore, Lockett is entitled to judgment as a matter of law on the medical care claim alleged against him.

Kadamovas asserts that Defendant Heiser denied him medical care in August 2010 and November 2010 when she refused his request for sick call because there was no treatment for food-borne poisoning. Dkt. No. 1, ¶¶ 43-45. Defendant Heiser is entitled to summary judgment

regarding the August 2010 claim. The undisputed evidence reflects that Heiser was not on duty at FCC Terre Haute in August of 2010.

As to the November 2010 incident, Kadamovas states in his response brief that, "[o]n November 3rd, 2010 this claim was presented to Kadamovas by Nurse Heiser and telling him that she was not going to refer him to either the PA or doctor because there wasn't anything that medical could do about food poisoning." Dkt. No. 50, p. 29. His response cites to paragraph 45 of his Complaint, which was signed under penalty of perjury. That paragraph provides:

> After suffering the plights of the uncooked/spoiled entrée November 12th and then aggravating this plight of food borne consequences eating a second uncooked entrée Sunday evening, November 14th, 2010 Kadamovas submitted yet another Sick Call Request the following morning after being refused access to medical by Officer Myers on the night of November 12th. Again Nurse Heiser reiterated almost verbatim what she had advised Kadamovas of on November 3rd after eating the uncooked/spoiled entrée on November 2nd. Nurse Heiser adamantly told Kadamovas that she was not submitting him to be seen by either a doctor or the P.A. no matter how bad the plights of the food poisoning was, because there was absolutely nothing medical could do regarding simple food poisoning. Here for almost three days after this Kadamovas continued to vomit blood, experience severe watery diarrhea, extreme abdominal pains and cramping and suffered a severe high temperature. It took approximately two weeks for these symptoms to entirely dissipate.

In response, the Defendants argue that Kadamovas' claims must fail against Heiser because she testified that she did not deny him medical care as alleged and Kadamovas did have medical care provided to him during November 2010. The Defendants state that procedures in the SCU require medical personnel to have a daily presence in the unit and that nurses are not the only staff that are responsible for, or who can assist, getting an inmate's sick call to a doctor or physician's assistant. The fact that Kadamovas may have had other opportunities to have requested a sick call visit, however, does not relieve Heiser from acting appropriately on his request for a sick call visit.

21

Given the specific testimony and evidence on record, there are material facts in dispute regarding whether Kadamovas suffered a serious medical need and whether Heiser was deliberately indifferent to that serious medical need. Accordingly, Heiser is not entitled to summary judgment as a matter of law as to the claim that she was deliberately indifferent to Kadamovas' serious medical needs in November 2010.

## V.  CONCLUSION

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases, summary judgment is appropriate.  *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Kadamovas has not identified a genuine issue of material fact as to his claims in Counts One or Two of this case, and the Defendants are entitled to judgment as a matter of law on those counts. As to Count Three, material facts are in dispute regarding whether Defendant Heiser was deliberately indifferent to Kadamovas' serious medical needs in November 2010. Accordingly, the motion for summary judgment (Dkt. No. 38) is **DENIED** as to Kadamovas' claim against Defendant Heiser with regard to his request for medical care in November 2010 and **GRANTED** in all other respects.

SO ORDERED:   09/30/2013

*William T Lawrence*
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

**Copy by United States Mail to:**

**Jurijus Kadamovas**
**Reg. No. 21050-112**
**Terre Haute U.S.P**
**Inmate Mail/Parcels**
**P.O. Box 33**
**Terre Haute, IN 47808**

Copies via electronic distribution to all counsel of record